UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

GARRY D. OLIVER, STEVEN J.
BLANCHARD, ANTHONY L. LAFOREST,
MICHAEL J. ASHER, TRACY E. ROBERTS
and PAUL J. GUALDONI as TRUSTEES of
the SHEET METAL WORKERS LOCAL NO.
292 PENSION FUND, Derivatively and on
Behalf of THE HAIN CELESTIAL GROUP,
INC.,

                Plaintiffs,

    vs.

RICHARD C. BERKE, ANDREW R. HEYER,
RAYMOND W. KELLY, ROGER
MELTZER, SCOTT M. O'NEIL, ADRIANNE
SHAPIRA, LAWRENCE S. ZILAVY, IRWIN
D. SIMON, PASQUALE CONTE, JOHN
CARROLL, DENISE M. FALTISCHEK,
ROSS WEINER and STEPHEN J. SMITH,

                Defendants,

  – and –

THE HAIN CELESTIAL GROUP, INC., a
Delaware corporation,

           Nominal Defendant.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, GROSS
MISMANAGEMENT, UNJUST
ENRICHMENT AND CORPORATE WASTE

DEMAND FOR JURY TRIAL

1.      This is a shareholder derivative action on behalf of nominal defendant The Hain Celestial Group, Inc. ("HCG" or the "Company") against its Board of Directors and certain current and former top officers for breach of fiduciary duty, gross mismanagement, unjust enrichment and corporate waste.

2.      Defendants are HCG's directors – defendants Richard C. Berke, Andrew R. Heyer, Raymond W. Kelly, Roger Meltzer, Scott M. O'Neil, Adrianne Shapira and Lawrence S. Zilavy; HCG's Chief Executive Officer, Chief Financial Officer, Executive Vice President and General Counsel – defendants Irwin D. Simon, Pasquale Conte, John Carroll and Denise M. Faltischek, respectively; and HCG's former Chief Accounting Officer and former Chief Financial Officer – defendants Ross Weiner and Stephen J. Smith, respectively (together, "defendants").

3.      Based in Lake Success, New York, HCG is an organic and natural products company with operations in North America, Europe and India.  The Company sells its products through distributors and resellers, including United Natural Foods, a distributor that accounted for approximately 12% of its sales, and Wal-Mart Stores, a retailer that accounted for approximately 10% of its sales.

4.      As HCG's corporate fiduciaries, defendants owed the Company and its shareholders fiduciary duties to conduct the corporation's business and affairs lawfully and to protect and preserve HCG's valuable corporate assets.  This notwithstanding, however, defendants caused HCG to engage in an unlawful scheme designed to artificially inflate the Company's publicly reported financial results and financial statements by engaging in unlawful revenue recognition practices in violation of Generally Accepted Accounting Principles ("GAAP").

5.      More specifically, between at least August 2015 and August 2016, defendants caused HCG to make false and/or misleading statements and/or fail to disclose material adverse facts about

the Company's business, operations, prospects and performance. For example, defendants caused HCG to misrepresent and/or fail to disclose that: (i) HCG had been improperly recognizing customer concessions as revenues; (ii) HCG's financial results were materially false and misleading in violation of GAAP; (iii) HCG's internal controls were so poor and materially inadequate that its reported results were not reliable; and (iv) as a result, the Company was not on track to achieve the financial results it stated it was on track to achieve in fiscal 2016. As a result of defendants' false and misleading statements, HCG common stock traded at artificially inflated prices of more than $62 per share during this period.

6. Defendants' scheme continued unabated until August 2016. Then, on August 15, 2016, HCG abruptly announced that it would delay the release of its fiscal fourth quarter and fiscal year 2016 financial results because, despite "the Company [having] recognized revenue pertaining to the sale of its products to certain distributors at the time the products [were] shipped to such distributors," HCG had "identified concessions that were granted to certain [of those] distributors in the United States." The Company further revealed that it was "evaluating whether the revenue associated with the concessions granted to certain distributors should instead have been recognized at the time the products sell through its distributors to the end customers." HCG said it was also "evaluating its internal control over financial reporting." In addition, HCG disclosed that its Audit Committee was "conducting an independent review of these matters and ha[d] retained independent counsel to assist in that review." Separately, HCG announced that it did "not expect to achieve its previously announced guidance for fiscal year 2016."

7. On this news, the trading price of HCG shares collapsed, falling more than $14 per share, or 26%, to $39.35 per share, instantly wiping out more than $1.4 billion in market capitalization. Worse yet, the Company has been named as a primary defendant in a costly and

expensive-to-defend class action lawsuit brought by HCG shareholders for alleged violations of the federal securities laws.

8.      Although HCG has been severely injured, defendants have not fared nearly so badly. On the contrary, defendants have collectively pocketed more than $23.1 million in salary, bonuses, fees and other incentive-based compensation payments that were not justified in light of HCG's performance while under their stewardship.  These payments wasted valuable corporate assets and unjustly enriched defendants.

9.      Nevertheless, the HCG Board of Directors ("Board") has not taken any legal action against the directors and officers responsible for this debacle.  Nor will they, because each of the defendants is interested in the outcome of any such legal action.  Accordingly, by this action, plaintiffs seek to vindicate HCG's interests against its wayward fiduciaries.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. §1332(a)(1).  Plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this Court under 28 U.S.C. §1391(b) because: (i) HCG maintains its principal place of business in this District; (ii) one or more of the defendants either reside(s) in or maintain(s) executive offices in this District; and (iii) a substantial portion of the transactions and

wrongs complained of herein, including the defendants' participation in the wrongful acts detailed herein, occurred in this District.

## THE PARTIES

**Plaintiffs**

13.     Plaintiffs Garry D. Oliver, Steven J. Blanchard, Anthony L. Laforest, Michael J. Asher, Tracy E. Roberts and Paul J. Gualdoni pursue this action in their capacity as Trustees of Sheet Metal Workers Local No. 292 Pension Fund, which is a HCG shareholder and has continuously held HCG stock since at least April 2015.  Each plaintiff is a citizen of the State of Michigan.

**Nominal Defendant**

14.     Nominal defendant HCG is a Delaware corporation with its principal executive offices located at 1111 Marcus Avenue, Lake Success, New York 11042.  The Company is an organic and natural products company with operations in North America, Europe and India.  HCG is a citizen of the States of Delaware and New York.

**Director Defendants**

15.     Defendant Richard C. Berke ("Berke") served as a director of HCG since April 2007. He also has served on the Compensation and Corporate Governance and Nominating Committees of the HCG Board.  Berke received at least $228,131 in directors' fees, consisting of cash and incentive stock awards, from HCG not justified by the Company's performance while under his stewardship. Defendant Berke is a citizen of the State of Florida.

16.     Defendant Andrew R. Heyer ("Heyer") has been a director of HCG since November 2012.  He also has served on the Audit Committee of the HCG Board.  Heyer received at least $238,131 in directors' fees, consisting of cash and incentive stock awards, from HCG not justified

- 4 -

by the Company's performance while under his stewardship.  Defendant Heyer is a citizen of the State of New York.

17.     Defendant Raymond W. Kelly ("Kelly") has been a director of HCG since August 2015.  He also has served on the Corporate Governance and Nominating Committee of the HCG Board.  In 2015 and 2016, Kelly received directors' compensation from HCG not justified by the Company while under his stewardship.   He also has served on Corporate Governance and Nominating Committees of the HCG Board.  Defendant Kelly is a citizen of the State of New York.

18.     Defendant Roger Meltzer ("Meltzer") has been a director of HCG since December 2000.  Meltzer received $228,131 in directors' fees, consisting of cash and incentive stock awards, from HCG not justified by the Company's performance while under his stewardship.  Defendant Meltzer is a citizen of the State of New York.

19.     Defendant Scott M. O'Neil ("O'Neil") has been a director of HCG since January 2012.  He also has served on the Compensation Committee of the HCG Board.  O'Neil received $238,131 in directors' fees, consisting of cash and incentive stock awards, from HCG not justified by the Company's performance while under his stewardship.  Defendant O'Neil is a citizen of the State of Pennsylvania.

20.     Defendant Adrianne Shapira ("Shapira") has been a director of HCG since November 2014.  She also has served on the Audit and Compensation Committees of the HCG Board.  Shapira received $201,631 in directors' fees, consisting of cash and incentive stock awards, from HCG not justified by the Company's performance while under her stewardship.  Defendant Shapira is a citizen of the State of New York.

21.     Defendant Lawrence S. Zilavy ("Zilavy") has been a director of HCG since November 2002.  He also has served on the Audit and Corporate Governance and Nominating

Committees of the HCG Board. Zilavy received $233,131 in directors' fees, consisting of cash and incentive stock awards, from HCG not justified by the Company's performance while under his stewardship. Defendant Zilavy is a citizen of the State of Florida.

**Officer Defendants**

22.     Defendant Irwin D. Simon ("Simon") has been HCG's Chief Executive Officer ("CEO") since 1993. He also has been a director of HCG since 1993. Simon received at least $16.3 million in salary, bonuses and performance-based compensation from HCG not justified by the Company's performance while under his stewardship. Defendant Simon is a citizen of the State of New York.

23.     Defendant Pasquale Conte ("Conte") has been HCG's Chief Financial Officer ("CFO") since September 2015. Previously, he served as HCG's Senior Vice President – Finance and Controller from October 2014 to September 2015. During his tenure at HCG, Conte received executive compensation from HCG not justified by the Company's performance while under his stewardship. Defendant Conte is a citizen of the State of New York.

24.     Defendant John Carroll ("Carroll") has been HCG's Executive Vice President and CEO of Hain Celestial North America since February 2015. Carroll received at least $2.5 million in salary, bonuses and performance-based compensation from HCG not justified by the Company's performance while under his stewardship. Defendant Carroll is a citizen of the State of New York.

25.     Defendant Denise M. Faltischek ("Faltischek") has been HCG's Executive Vice President, General Counsel and Chief Compliance Officer since November 2013. Faltischek received at least $2.2 million in salary, bonuses and performance-based compensation from HCG not justified by the Company's performance while under her stewardship. Defendant Faltischek is a citizen of the State of New York.

**Former Officer Defendants**

26.     Defendant Ross Weiner ("Weiner") served as HCG's Chief Accounting Officer from April 2014 to February 2016.  During his tenure at HCG, Weiner received executive compensation from HCG not justified by the Company's performance while under his stewardship.  Defendant Weiner is a citizen of the State of New York.

27.     Defendant Stephen J. Smith ("Smith") served as HCG's CFO from September 2013 to September 2015.  Smith received at least $816,568 in salary, bonuses and performance-based compensation from HCG not justified by the Company's performance while under his stewardship. Defendant Smith is a citizen of the State of New York.

### THE FIDUCIARY DUTIES OF HCG'S DIRECTORS AND OFFICERS

28.     By reason of their positions as HCG's directors and/or officers and because of their ability to direct and controls the Company's business and corporate affairs, defendants owed HCG and its shareholders a fiduciary duty to use their utmost ability to control and manage HCG in an honest and lawful manner.  Towards this end, HCG's directors and officers owed the Company and its shareholders fiduciary duties to exercise good faith and loyal and reasonable supervision over the Company' s management, policies, practices and internal controls of the Company.

29.     More specifically, as HCG's directors and officers, defendants' fiduciary duties required them to, among other things: (i) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public; (ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to lawfully maximize the value of the Company's stock; (iii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making

- 7 -

accurate statements about the Company's financial results and internal controls; (iv) remain fully informed as to how HCG conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the securities laws; (v) ensure that HCG was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations, including the federal securities laws, rules and regulations; and (vi) refrain from breaching their duty of loyalty to the Company by adopting practices and procedures and controls inconsistent with their fiduciary duty of loyalty.

30.     The Audit Committee Charter of the HCG Board confirms the oversight responsibility of the directors.  More specifically, the Audit Committee Charter provides, in relevant part, as follows:

**Purpose**

The primary purpose of the Audit Committee is to assist the Board of Directors' oversight of (1) the integrity of the Company's financial statements, (2) the independent auditor's qualifications, independence, and performance, and (3) the performance of the Company's internal controls and procedures.

The Audit Committee shall prepare an Audit Committee report, as required by the rules and regulations of the SEC, to be included in the Company's annual proxy statement.

\*       \*       \*

**Powers and Responsibilities**

**A.     Oversight of the Company's Financial Statements and Disclosure Practices**

The Audit Committee shall:

1)     Discuss with management and the independent auditor the Company's annual audited financial statements, including the Company's disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board of Directors whether such

audited financial statements should be included in the Company's annual report on Form 10-K.

2) Discuss with management and the independent auditor the Company's quarterly financial statements, including the Company's disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

3) Review the Company's disclosure controls and procedures, internal controls and procedures for financial reporting, and the certifications required to be made by any officer of the Company in each of the Company's quarterly reports on Form 10-Q and the Company's annual report on Form 10-K (the "*Periodic Reports*").

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

31. In committing the wrongful acts complained of herein, defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design. In addition to the wrongful conduct complained of herein giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their fiduciary duties.

32. Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such action to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

33. HCG manufactures, markets, distributes and sells organic and natural products through a variety of distributors and resellers, including United Natural Foods and Wal-Mart Stores. Defendants, as corporate fiduciaries, owed HCG and its shareholders a fiduciary duty to conduct the Company's business and operations in strict accordance with the laws, including the federal securities laws, as well as to protect and preserve HCG's valuable corporate assets. Between at least

August 2015 and August 2016, however, defendants, in breach of their fiduciary duties, caused the Company to embark upon an unlawful scheme designed to artificially inflate HCG's publicly reported financial results and financial statements by engaging in unlawful revenue recognition practices in violation of GAAP.

34.     Towards that end, on August 21, 2015, defendants caused HCG to file its Annual Report on SEC Form 10-K for the fiscal fourth quarter and year ended June 30, 2015.  The Form 10-K was approved, reviewed and/or signed by defendants Simon, Smith, Weiner, Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy, Carroll and Faltischek.  The Form 10-K also misrepresented that the Company's publicly reported financial results and financial statements were being prepared in accordance with GAAP, and that the Company's revenues were being recognized net of all customer incentives or other sales concessions.  In particular, the Form 10-K stated, in relevant part, as follows:

*Revenue Recognition*

*Sales are recognized when the earnings process is complete, which occurs when products are shipped in accordance with terms of agreements, title and risk of loss transfer to customers, collection is probable and pricing is fixed or determinable.  Sales are reported net of sales and promotion incentives, which include trade discounts and promotions and certain coupon costs*.  Shipping and handling costs billed to customers are included in reported sales.  *Allowances for cash discounts are recorded in the period in which the related sale is recognized*.

*Sales and Promotion Incentives*

Sales incentives and promotions include price discounts, slotting fees and coupons and are used to support sales of the Company's products.  *These incentives are deducted from our gross sales to determine reported net sales*.  The recognition of expense for these programs involves the use of judgment related to performance and redemption estimates.  Differences between estimated expense and actual redemptions are normally insignificant and recognized as a change in estimate in the period such change occurs.

*Trade Promotions.  Accruals for trade promotions are recorded primarily at the time a product is sold to the customer based on expected levels of performance*.  Settlement of these liabilities typically occurs in subsequent

periods primarily through an authorization process for deductions taken by a customer from amounts otherwise due to the Company.[1]

35.    On November 5, 2015, defendants caused HCG to announce its financial results for the first fiscal quarter ended September 30, 2015, in a Form 8-K filed with the SEC.  The Form 8-K was reviewed and approved by the Board.  For the quarter, the Company reported operating income of $57.5 million, or $0.30 per diluted share, on net sales of $687.2 million, compared to operating income of $28.8 million, or $0.19 per diluted share, on net sales of $642.6 million for the same period in the prior year.

36.    The November 5, 2015 Form 8-K further stated, in relevant part, as follows:

**First Quarter Performance Highlights**

- Record first quarter net sales of $687.2 million, a 9% increase over the prior year period or, on a constant currency basis, an 11% increase over prior year adjusted net sales of $642.6 million.  Net sales were negatively impacted by $24 million as a result of foreign exchange rate movements versus a year ago.

- Record first quarter earnings per diluted share of $0.30, a 67% increase; adjusted earnings per diluted share of $0.37, a 9% increase.  Foreign currencies negatively impacted reported results by $0.01 per diluted share.

- Operating income of $57.5 million, 8.4% of net sales; adjusted operating income of $63.2 million, 9.2% of net sales.

"We began fiscal year 2016 with record first quarter net sales and earnings growth.  Our diversified portfolio delivered strong growth with contribution from our Hain Pure Protein Corporation segment ("HPPC"), with our FreeBird® and Plainville Farms® brands growing 27%, as well as our international businesses in Canada, Continental Europe and the United Kingdom in constant currency, which collectively grew 22%," said Irwin D. Simon, Founder, President and Chief Executive Officer of Hain Celestial. . . .  "We continued to benefit from the diversification of our business across our branded organic and natural product categories, sales channels and geographies, which fueled solid worldwide results in our typically lowest sales and profitability quarter."

---

[1]    Here, as elsewhere, emphasis is added unless otherwise noted.

37.     As to the Company's financial outlook, the Form 8-K stated, in relevant part, as follows:

The Company reiterated its annual guidance for fiscal year 2016:

- Total net sales range of $2.97 billion to $3.11 billion, an increase of approximately 10% to 15% as compared to fiscal year 2015;

- Earnings range of $2.11 to $2.26 per diluted share, an increase of 12% to 20% as compared to fiscal year 2015.

38.     On November 9, 2015, defendants caused HCG to file its Quarterly Report on SEC Form 10-Q for the first fiscal quarter ended September 30, 2015.  The Form 10-Q was reviewed and approved by the Board, signed by defendants Simon and Conte, and reiterated the Company's first quarter financial results reported on November 5, 2015.  In particular, the Form 10-Q, reviewed and approved by defendants Simon, Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy, Conte, Carroll, Faltischek and Weiner, stated, in relevant part, as follows:

Net Sales

Net sales for the three months ended September 30, 2015 were $687.2 million, an increase of $55.9 million, or 9%, from net sales of $631.3 million for the three months ended September 30, 2014.

The sales increase resulted from the acquisitions of Mona in July 2015, Empire in March 2015, and Belvedere in February 2015 which collectively accounted for approximately $52.0 million in the first quarter and which includes those businesses growth under our ownership. Additionally, in the prior year quarter, sales were impacted by $10.4 million of sales returns related to the voluntary nut butter recall and by $0.9 million related to a non-dairy beverage withdrawal in Europe.  Foreign exchange rates resulted in decreased net sales of $24.4 million as compared to the prior year period. . . .

Gross Profit

Gross profit for the three months ended September 30, 2015 was $152.0 million, an increase of $26.2 million, or 20.8%, from last year's first quarter.  The increase in gross profit primarily resulted from the impact of the voluntary nut butter recall in the prior year quarter (which in addition to the aforementioned impact on sales, also impacted cost of sales by $9.9 million for inventory write-offs), sales from the aforementioned acquisitions and growth attributable to the increases in the

- 12 -

volume of our products sold.  We incurred what we expect to be the last of our start and ramp-up costs of certain lines in our chilled desserts factory in the United Kingdom, which totaled $0.7 million in the quarter.  Such costs during the prior year quarter were $2.7 million.  Additionally, in the current quarter, we recorded charges of $0.4 million related to a warehouse consolidation project in the United States and integration costs of $0.5 million related to the current quarter acquisition of Mona. Finally, the mix of our products sold in the period as well as increased product costs impacted gross profit.

*      *      *

<u>Operating Income</u>

Operating income for the three months ended September 30, 2015 was $57.5 million, an increase of $28.6 million, or 99.4%, from $28.8 million in the three months ended September 30, 2014.  Operating income as a percentage of net sales was 8.4% in the second quarter of fiscal 2015 compared with 4.6% in the third quarter of fiscal 2014.  The increase in operating income as a percentage of net sales resulted from the items described above.

39.     As to the Company's accounting policies regarding revenue recognition and sales and promotional incentives, the Form 10-Q further stated, in relevant part, as follows:

Our financial statements are prepared in accordance with accounting principles generally accepted in the United States. . . .  The accounting policies that have been identified as critical to our business operations and understanding the results of our operations pertain to revenue recognition, sales and promotional incentives . . . .  The application of each of these critical accounting policies and estimates was discussed in Item 7 of our Annual Report on Form 10-K for the fiscal year ended June 30, 2015.

40.     In addition, the Form 10-Q included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Simon and Conte certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The certifications stated, in relevant part, as follows:

<u>CERTIFICATION</u>

I, Irwin D. Simon, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of The Hain Celestial Group, Inc.;

- 13 -

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2015

/s/ Irwin D. Simon
Irwin D. Simon
President and Chief Executive Officer

<u>CERTIFICATION</u>

I, Pasquale Conte, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of The Hain Celestial Group, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2015

/s/ Pasquale Conte
Pasquale Conte
Executive Vice President and
Chief Financial Officer

41.    On February 1, 2016, defendants caused HCG to announce its financial results for the second fiscal quarter ended December 31, 2015, in a Form 8-K filed with the SEC.  The Form 8-K was reviewed and approved by the Board.  For the quarter, the Company reported operating income of $87.7 million, or $0.55 per diluted share, on net sales of $752.6 million, compared to operating income of $74 million, or $0.44 per diluted share, on net sales of $696.4 million for the same period in the prior year.

42.    The February 1, 2016 Form 8-K further stated, in relevant part, as follows:

**Second Quarter Performance Highlights**

- Record net sales of $752.6 million, an 8% increase, or 11% on a constant currency basis, over prior year net sales of $696.4 million.  Net sales were impacted by $18.3 million as a result of foreign exchange rate movements versus a year ago.

- Earnings per diluted share of $0.55, a 28% increase; adjusted earnings per diluted share of $0.57, a 6% increase.  Foreign currencies impacted reported results by $0.01 per diluted share.

- Record operating income of $87.7 million, 11.7% of net sales; adjusted operating income of $92.9 million, 12.3% of net sales.

- Strong operating cash flow of $93.9 million, an increase of 82% over the prior year quarter.

"Our record net sales reflect the continuing strong performance from the United Kingdom and Rest of World segments, which collectively grew 12% in constant currency and the Hain Pure Protein Corporation segment ("HPPC"), which grew 21% excluding the acquisition of Empire®.  Our strong sales growth was impacted in the quarter primarily by reductions in inventories at certain customers in the United States segment," said Irwin D. Simon, Founder, President and Chief Executive Officer of Hain Celestial.  "We were able to deliver these strong results, reflecting our global diversified business model across Hain Celestial's organic and natural brands, product categories, customers and geographies."

*       *       *

The Company earned net income of $56.9 million, a 28% increase, and adjusted net income of $59.2 million, a 7% increase, compared to the prior year period.  Earnings per diluted share for the second quarter were $0.55, a 28% increase compared to the prior year period.  On an adjusted basis earnings per diluted share for the second quarter were $0.57, a 6% increase compared to the prior year period. . . .

"Hain Celestial continues to be at the forefront of the evolution around changing consumer trends in consumer packaged goods with a strong global brand portfolio in key growth categories.  We are uniquely positioned to satisfy the health and wellness needs of consumers with our leading natural and organic products as we work to deliver increased shareholder value," concluded Irwin Simon.

43.     As to the Company's financial outlook, the Form 8-K stated, in relevant part, as follows:

The Company reiterated its fiscal year 2016 guidance expectations of:

- Total net sales range of $2.90 billion to $3.04 billion, an increase of approximately 7% to 12% as compared to fiscal year 2015, and

- Earnings per diluted share range of $1.95 to $2.10, an increase of approximately 4% to 12% as compared to fiscal year 2015.

With respect to the cadence of the second half of the Company's fiscal year financial results, the Company expects net sales to be slightly lower in the third quarter as compared to the fourth quarter, while 42% to 46% of the Company's second half earnings will be in the third quarter and the balance in the fourth quarter.

44.     On February 9, 2016, defendants caused HCG to file its Quarterly Report on SEC Form 10-Q for the second fiscal quarter ended December 31, 2015.  The Form 10-Q was reviewed and approved by the Board, signed by defendants Simon and Conte, and reiterated the Company's second quarter financial results reported on February 1, 2016.  In particular, the Form 10-Q, reviewed and approved by defendants Simon, Weiner, Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy, Conte, Carroll and Faltischek stated, in relevant part, as follows:

Net Sales

Net sales for the three months ended December 31, 2015 were $752.6 million, an increase of $56.2 million, or 8%, from net sales of $696.4 million for the three months ended December 31, 2014.  Foreign exchange rates resulted in decreased net sales of $18.3 million as compared to the prior year quarter.  On a constant currency basis, net sales increased 11% from the prior year quarter.  The sales increase primarily resulted from our recent acquisitions of Mona in July 2015, EK Holdings, Inc. ("Empire") in March 2015 and Belvedere International, Inc. ("Belvedere") in February 2015, which collectively accounted for approximately $59.0 million in the second quarter and which includes those businesses growth under our ownership.  Additionally, in the prior year quarter, sales were impacted by $5.3 million of sales returns related to the voluntary nut butter recall. . . .

Gross Profit

Gross profit for the three months ended December 31, 2015 was $177.6 million, an increase of $10.2 million, or 6.1%, from last year's second quarter.  The increase in gross profit was due to the increase in sales on a year over year basis. Gross profit margin was 23.6% of sales, down 40 basis points year over year.  Gross profit margin was unfavorably impacted by an increase in trade promotions and product mix in the United States, increased product costs of United States dollar denominated purchases in Canada, and a 7 day production interruption related to a chiller breakdown at one of our Hain Pure Protein Corporation ("HPPC") facilities, which were partially offset by more sales of organic poultry products at HPPC and favorable margin increases at Tilda due to improved procurement of raw materials. In the prior year quarter, gross profit margin was unfavorably impacted by start-up costs of certain lines in our chilled desserts factory in the United Kingdom.

*        *        *

- 18 -

Operating Income

Operating income for the three months ended December 31, 2015 was $87.7 million, an increase of $13.7 million, or 18.5%, from $74.0 million in the three months ended December 31, 2014. Operating income as a percentage of net sales was 11.7% in the second quarter of fiscal 2016 compared with 10.6% in the prior year quarter. The increase in operating income as a percentage of net sales resulted from the items described above. Foreign exchange rates resulted in decreased operating income of $1.5 million as compared to the prior period.

45.     As to the Company's accounting policies regarding revenue recognition and sales and promotional incentives, the Form 10-Q further stated, in relevant part, as follows:

Our financial statements are prepared in accordance with accounting principles generally accepted in the United States. . . . The accounting policies that have been identified as critical to our business operations and understanding the results of our operations pertain to revenue recognition, sales and promotional incentives . . . . The application of each of these critical accounting policies and estimates was discussed in Item 7 of our Annual Report on Form 10-K for the fiscal year ended June 30, 2015.

46.     In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Simon and Conte certifying that the financial information contained in the February 9, 2016 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The certifications stated, in relevant part, as follows:

CERTIFICATION

I, Irwin D. Simon, certify that:

1. I have reviewed this quarterly report on Form 10-Q of The Hain Celestial Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2016

/s/ Irwin D. Simon
Irwin D. Simon
President and Chief Executive Officer

<u>CERTIFICATION</u>

I, Pasquale Conte, certify that:

1. I have reviewed this quarterly report on Form 10-Q of The Hain Celestial Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

- 21 -

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2016

/s/ Pasquale Conte
Pasquale Conte
Executive Vice President and
Chief Financial Officer

47.     On May 4, 2016, defendants caused HCG to announce its financial results for the third fiscal quarter ended March 31, 2016, in a Form 8-K filed with the SEC.  The Form 8-K was reviewed and approved by the Board.  For the quarter, the Company reported operating income of $69.0 million, or $0.47 per diluted share, on net sales of $750 million, compared to operating income of $60.1 million, or $0.33 per diluted share, on net sales of $662.7 million for the same period in the prior year.

48.     The May 4, 2016 Form 8-K further stated, in relevant part, as follows:

**Third Quarter Performance Highlights**

- Net sales of $750.0 million, a 13% increase, or 15% on a constant currency basis, over prior year period net sales of $662.7 million.  Net sales were impacted by $13.9 million of foreign exchange rate movements versus a year ago.

*      *      *

- Earnings per diluted share of $0.47, a 47% increase over the prior year period, or on an adjusted basis $0.49, a 9% increase over the prior year period.  Foreign currencies impacted reported results by $0.01 per diluted share.

- Operating income of $69.0 million, or 9.2% of net sales; adjusted operating income of $80.4 million, or 10.7% of net sales.

\*       \*       \*

"Our net sales reflect the strong performance across our businesses led by Hain Celestial United States, Hain Pure Protein, Hain Celestial United Kingdom and Hain Celestial Europe as well as Hain Celestial Canada," said Irwin D. Simon, Founder, President and Chief Executive Officer of Hain Celestial. "The diversification of our product portfolio with leading organic, natural and better-for-you brands around the world, combined with our team's solid execution of our operational initiatives fueled our financial performance. We are extremely pleased with our US results where we returned to growth in the third quarter and expect these trends to continue."

\*       \*       \*

The Company earned net income of $49.0 million, a 47% increase, and adjusted net income of $50.6 million, a 9% increase, compared to the prior year period. Earnings per diluted share for the third quarter were $0.47, a 47% increase compared to the prior year period. On an adjusted basis earnings per diluted share for the third quarter were $0.49, a 9% increase compared to the prior year period.

49.     As to the Company's financial outlook, the Form 8-K stated, in relevant part, as follows:

The Company updated its fiscal year 2016 guidance expectations:

- Total net sales range of $2.946 billion to $2.966 billion, an increase of approximately 9% to 10% as compared to fiscal year 2015, and

- Earnings per diluted share range of $2.00 to $2.04, an increase of approximately 6% to 9% as compared to fiscal year 2015.

50.     On May 9, 2016, defendants caused HCG to file its Quarterly Report on SEC Form 10-Q for the third fiscal quarter ended March 31, 2016. The Form 10-Q was reviewed and approved by the Board, signed by defendants Simon and Conte, and reiterated the Company's third quarter financial results reported on May 4, 2016. In particular, the Form 10-Q, reviewed and approved by defendants Simon, Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy, Conte, Carroll and Faltischek, stated, in relevant part, as follows:

Net Sales

- 23 -

Net sales for the three months ended March 31, 2016 were $749.9 million, an increase of $87.1 million, or 13%, from net sales of $662.7 million for the three months ended March 31, 2015.  Foreign exchange rates negatively impacted net sales by $13.9 million as compared to the prior year quarter.  On a constant currency basis, net sales increased 15% from the prior year quarter.  The sales increase primarily resulted from our recent acquisitions of Orchard House in December 2015, Mona in July 2015, EK Holdings, Inc. ("Empire") in March 2015 and Belvedere International, Inc. ("Belvedere") in February 2015, which collectively accounted for approximately $93.5 million in the third quarter of 2016, which includes the growth of these businesses under our ownership, from $18.0 million in the prior year quarter. . . .

Gross Profit

Gross profit for the three months ended March 31, 2016 was $173.2 million, an increase of $15.5 million, or 9.8%, from last year's third quarter.  The increase in gross profit was due to the increase in sales on a year over year basis.  Gross profit margin was 23.1% of sales, down 70 basis points year over year.  Gross profit margin was unfavorably impacted by product mix in the United States primarily due to lower sales of Celestial Seasonings tea resulting from the new packaging launch, increased product costs of United States dollar denominated purchases in Canada, and additional costs related to a chiller breakdown and resultant temporary stop in production at one of our Hain Pure Protein Corporation ("HPPC") turkey facilities of $2.6 million, which were partially offset by increased sales of higher margin branded products at both HPPC and Europe.  In the prior year quarter, gross profit margin was unfavorably impacted by start-up costs of certain lines in our chilled desserts factory in the United Kingdom totaling $2.5 million and $1.6 million of additional factory expenses associated with bringing our nut butter production facility back to full operations after the previously mentioned nut butter recall, as well as expenses associated with the restructuring and relocation of our New York-based BluePrint manufacturing facility in the United States segment.

\*       \*       \*

Operating Income

Operating income for the three months ended March 31, 2016 was $69.0 million, an increase of $8.8 million, or 14.6%, from $60.2 million in the three months ended March 31, 2015.  Operating income as a percentage of net sales was 9.2% in the third quarter of fiscal 2016 compared with 9.1% in the prior year quarter.  The increase in operating income as a percentage of net sales resulted from the items described above.

51.    As to the Company's accounting policies regarding revenue recognition and sales and promotional incentives, the Form 10-Q further stated, in relevant part, as follows:

Our financial statements are prepared in accordance with accounting principles generally accepted in the United States. . . .  The accounting policies that have been identified as critical to our business operations and understanding the results of our operations pertain to revenue recognition, sales and promotional incentives . . . .  The application of each of these critical accounting policies and estimates was discussed in Item 7 of our Annual Report on Form 10-K for the fiscal year ended June 30, 2015.

52.     In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Simon and Conte certifying that the financial information contained in the May 9, 2016 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The certifications stated, in relevant part, as follows:

<u>CERTIFICATION</u>

I, Irwin D. Simon, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of The Hain Celestial Group, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2016

/s/ Irwin D. Simon
Irwin D. Simon
President and Chief Executive Officer

<u>CERTIFICATION</u>

I, Pasquale Conte, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of The Hain Celestial Group, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition,

results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2016

/s/ Pasquale Conte
Pasquale Conte

Executive Vice President and
Chief Financial Officer

53.   Propelled by these positive statements, the trading price of HCG stock soared to as high as $56.99 per share on August 12, 2016.  But, in truth, the statements in ¶¶34-52 above were materially false and misleading when made and/or failed to disclose adverse facts about the Company's business, operations, prospects and performance.  For example, defendants caused HCG to misrepresent and/or fail to disclose that: (i) HCG had been improperly recognizing customer concessions as revenues; (ii) HCG's financial results were materially false and misleading in violation of GAAP; (iii) HCG's internal controls were so poor and materially inadequate that its reported results were not reliable; and (iv) as a result, the Company was not on track to achieve the financial results it stated it was on track to achieve in fiscal year 2016.

54.   Defendants' scheme continued unabated until August 2016.  Then, on August 15, 2016, defendants were forced to disclose the defects in the Company's accounting and internal controls.  In a Form 8-K, HCG stated, in relevant, part as follows:

> The HCG Celestial Group, Inc. . . . announced today that it will delay the release of its fourth quarter and fiscal year 2016 financial results.  During the fourth quarter, the Company identified concessions that were granted to certain distributors in the United States.  The Company is currently evaluating whether the revenue associated with those concessions was accounted for in the correct period and is also currently evaluating its internal control over financial reporting.  The Audit Committee of the Company's Board of Directors is conducting an independent review of these matters and has retained independent counsel to assist in that review.
>
> Previously, the Company has recognized revenue pertaining to the sale of its products to certain distributors at the time the products are shipped to such distributors.  The Company is evaluating whether the revenue associated with the concessions granted to certain distributors should instead have been recognized at the time the products sell through its distributors to the end customers.  The Company expects that any potential changes in the timing of the recognition of revenue with respect to these transactions should not impact the total amount of revenue ultimately recognized by the Company with respect to such distributors and does not reflect on the validity of the underlying transactions with respect to such distributors.

The Company will experience a delay in the timely filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016 (the "Form 10-K") and expects to file a notification of late filing on Form 12b-25 with the Securities and Exchange Commission to obtain an automatic 15-day extension of the filing deadline for the Form 10-K. There can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period.

The Company will not be in a position to release financial results until the completion of the independent review of the Audit Committee and of the audit process relating to the 2016 fiscal year. The Company is working diligently on this matter and will, as soon as practicable, make a further announcement regarding the updated timing of the release of financial results and a conference call on its financial results. Separately, the Company does not expect to achieve its previously announced guidance for fiscal year 2016.

55.     As a result of these disclosures, the price of HCG common stock collapsed, falling more than $14 per share, or 26%, to close at $39.35 per share on August 16, 2016, wiping out more than $1.4 billion in market capitalization.

## DAMAGE TO HCG

56.     As a direct and proximate result of defendants' misconduct, HCG has been severely damaged and injured. Moreover, defendants' faithless acts and/or omissions have irreparably damaged HCG's credibility, corporate image and goodwill. For at least the foreseeable future, HCG will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in improper behavior and have misled the investing public, such that HCG's ability to raise equity capital or debt on favorable terms in the future is now impaired. Further, as a direct and proximate result of defendants' misconduct, HCG has been named a defendant in costly and expensive-to-defend class action lawsuits for violations of the federal securities laws. *See, e.g.*, *Flora v. The Hain Celestial Group, Inc., et al.*, No. 2:16-cv-04589-ADS-SIL (E.D.N.Y.).

## DERIVATIVE ALLEGATIONS

57.     Plaintiffs incorporate ¶¶1-56.

58.     Plaintiffs bring this action derivatively on behalf of HCG to redress injuries suffered, and to be suffered, by HCG as a result of defendants' breaches of fiduciary duty, gross mismanagement, unjust enrichment and corporate waste.

59.     Plaintiffs will adequately and fairly represent the interests of HCG in enforcing and prosecuting these derivative claims.

60.     Defendants Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy and Simon, as members of the HCG's Board, breached their fiduciary duty of loyalty (and candor and good faith) and engaged in unlawful conduct.  Accordingly, a pre-suit demand on the HCG Board to commence, let alone vigorously prosecute, this action is a useless and futile act, and is therefore excused.

61.     First, the members of HCG's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

62.     Second, the members of the HCG Board participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from HCG's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or board meetings, each of the defendants knew the adverse non-public information regarding HCG's business and financial condition.  Pursuant to their specific duties as Board members, the members of the HCG Board are

charged with the management of the Company and to conduct its business affairs. Defendants Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy and Simon breached their fiduciary duty of loyalty (and candor and good faith) owed to HCG and its shareholders in that they caused false and misleading statements about HCG's business and financial conditions to be made to HCG shareholders. Thus, the HCG Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other defendants who did.

63. Third, the acts complained of constitute violations of the fiduciary duty of loyalty (and candor and good faith) owed by HCG's directors and these acts are incapable of ratification.

64. Fourth, the members of HCG's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

65. Fifth, any suit by the directors of HCG to remedy these wrongs would likely further expose the liability of defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

66. Sixth, HCG has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the HCG Board has not filed any lawsuits against defendants or others who were responsible for that wrongful conduct to attempt to recover for HCG any part of the damages HCG suffered and will suffer thereby.

67.     Seventh, defendants Heyer, Shapira and Zilavy served as members of the Audit Committee.  As such, these defendants were responsible for reviewing the adequacy of HCG's internal controls, reviewing the integrity of HCG's annual and quarterly financial results and financial statements, and reviewing HCG's annual and quarterly earnings press releases. Nonetheless, defendants Heyer, Shapira and Zilavy breached their fiduciary duties, along with the entire HCG Board, by causing HCG to make false and misleading statements to shareholders in the Company's earnings releases and SEC filings, as well as by failing to ensure that adequate internal controls were in place at the Company's operations.  As a result, defendants Heyer, Shapira and Zilavy are not disinterested and face a substantial likelihood of liability that renders a pre-suit demand upon them futile.

68.     Eighth, defendant Simon is employed full time by the Company and has received and will continue to receive substantial monetary compensation as a result of that employment. Defendant Simon will act to preserve and not threaten his position of control and the perquisites thereof and therefore is incapable of exercising independent objective judgment in deciding whether to bring this action.

69.     Ninth, demand is excused because the conduct alleged herein, including the issuance of false and misleading statements to shareholders, was not the product of a valid exercise of business judgment.  Defendants' misconduct alleged herein, including the issuance of false and misleading statements to shareholders, was so egregious on its face that Board approval cannot meet the test of business judgment and a substantial likelihood of director liability for breach of fiduciary duty therefore exists.

70.     Plaintiffs have not made any demand on shareholders of HCG to institute this action since such demand would be a futile and useless act for the following reasons:

(a)      HCG is a publicly traded company with more than 103.4 million shares outstanding and hundreds or thousands of shareholders;

(b)      Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)      Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

71.      Plaintiffs incorporate ¶¶1-70.

72.      By their wrongful acts and omissions, defendants Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy, Simon, Conte, Carroll, Faltischek, Wiener and Smith breached their fiduciary duties to direct HCG's business and affairs in accordance with the laws, rules and regulations applicable to its business, including the federal securities laws, rules and regulations. Defendants' disloyalty regarding HCG's legal compliance has severely damaged the Company. Further, defendants breached their fiduciary duty of loyalty by, among other things, making materially false statements and/or omissions regarding HCG's business and financial condition in the Company's publicly reported financial results, financial statements and shareholder reports and failing to adopt and implement effective internal controls and accounting systems, policies, practices and procedures.

73.      As a result of defendants' faithless misconduct, HCG has suffered millions in damages, injuries and losses.

74.      Plaintiffs, on behalf of HCG, have no adequate remedy at law.

## COUNT II

### Against All Defendants for Gross Mismanagement

75.     Plaintiffs incorporate ¶¶1-70.

76.     By their wrongful acts and omissions, defendants Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy, Simon, Conte, Carroll, Faltischek, Weiner and Smith grossly mismanaged HCG's valuable corporate assets by, among other things, directing the Company's business and affairs in a manner inconsistent with the laws, rules and regulations applicable to HCG's operations, including the federal securities laws, rules and regulations.  As a result of defendants' gross mismanagement, the Company has suffered millions in damages, injuries and losses.

77.     Plaintiffs, on behalf of HCG, have no adequate remedy at law.

## COUNT III

### Against All Defendants for Unjust Enrichment

78.     Plaintiffs incorporate ¶¶1-70.

79.     By their wrongful acts and omissions, defendants Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy, Simon, Conte, Carroll, Faltischek, Weiner and Smith were unjustly enriched at the expense and to the detriment of HCG.

80.     All the payments and benefits provided to defendants were at the expense of HCG. The Company received no benefit from these payments.

81.     Plaintiffs, on behalf of HCG, seek restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

82.     Plaintiffs, on behalf of HCG, have no adequate remedy at law.

## COUNT IV

### Against All Defendants for Corporate Waste

83.     Plaintiffs incorporate ¶¶1-70.

84.     By their wrongful acts and omissions, defendants Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, Zilavy, Simon, Conte, Carroll, Faltischek, Weiner and Smith wasted HCG's valuable corporate assets by, among other things, causing the Company to pay improper compensation, bonuses and other benefits to certain HCG executives who breached their fiduciary duties owed to HCG and its shareholders.  HCG received no benefit from these improper payments. As a result, defendants damaged HCG and are liable to the Company for corporate waste.

85.     Plaintiffs, on behalf of HCG, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.     Awarding money damages against all defendants, jointly and severally, for all damages, injuries and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

B.     Directing all defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees and insider sales proceeds, and imposing a constructive trust thereon;

C.     Directing HCG to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, the federal securities laws, rules and regulations, and state corporation laws regarding fiduciary duties;

D.      Awarding punitive damages;

E.      Awarding costs and disbursements of this action, including reasonable attorneys',

accountants' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  September 14, 2017              ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       MARIO ALBA JR.
                                       MARY K. BLASY


                                              */s/ Samuel H. Rudman*
                                       SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)
                                       srudman@rgrdlaw.com
                                       malba@rgrdlaw.com
                                       mblasy@rgrdlaw.com

                                       ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                       BENNY C. GOODMAN III
                                       ERIK LUEDEKE
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)
                                       bennyg@rgrdlaw.com
                                       eluedeke@rgrdlaw.com

SACHS WALDMAN, P.C.
JOSEPH PAWLICK
1423 East Twelve Mile Road
Madison Heights, MI  48071
Telephone:  248/658-0800
248/658-0801 (fax)

Attorneys for Plaintiffs

**VERIFICATION**

I, _Chuck Wytrychowski_, on behalf of the Sheet Metal Workers Local No. 292 Pension Fund, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Gross Mismanagement, Unjust Enrichment and Corporate Waste ("Complaint"), and that the fund authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this _13_ day of _September_, 2017.

SHEET METAL WORKERS LOCAL NO. 292
PENSION FUND

By: _____
Administrator